OPINION
This is an appeal from the Portage County Court of Common Pleas. Appellant, Robert A. Prosen, Jr., appeals his conviction of child endangering.
On July 25, 1997, appellant was charged with endangering a child, in violation of R.C. 2919.22(B)(1) and (E), a felony of the third degree. Appellant was arraigned and entered a plea of not guilty to the charge on July 31, 1997. A jury trial was held on January 27, 1998.
At the trial, the evidence presented by appellee, the state of Ohio, revealed that appellant and his girlfriend, Lisa Hlad ("Lisa"), had a son together on November 12, 1996. After Lisa returned to work from her maternity leave, her mother Kathleen Hlad ("Kathleen"), babysat the infant. She watched the infant from December 9, 1996 to December 13, 1996. The following week appellant was on vacation so he took care of his son. Kathleen babysat her grandson again on Christmas Eve. On that day, Kathleen testified that she noticed some swelling on the baby's leg, but thought it was a spider bite. She indicated that the next day when she saw him, the swelling had gone down. She explained that around New Year's Day, the infant's leg "got a little worse or something happened with his leg."
Lisa testified that she recalled on December 18, 1996, appellant told her that while he was giving the baby a bath, the infant slipped into the water. She asked appellant if the baby was all right and noticed that he was fine when she saw him. She also stated that the baby did not appear to be doing anything unusual. On Christmas Eve, Lisa's mother told her about the swelling on the baby's leg, but she noticed that the following day it had decreased. Lisa did not seek medical attention because the infant was not acting differently and because she thought it was a bug bite. On either December 31, 1996 or January 1, 1997, Lisa noticed that the baby's "leg was swollen again and his foot was also swollen at that time," so she telephoned her pediatrician, Dr. Rosita Villanueva ("Dr. Villanueva"). On January 3, 1997, Kathleen took the child to Dr. Villanueva's office and appellant met her there.
At the trial, Dr. Villanueva, who had been the baby's pediatrician since his birth, stated that after she examined him and ran some tests, she discovered that he had "a displaced fracture of the femur." When Kathleen and appellant were told that the infant's leg was broken, they were both shocked. Dr. Villanueva proceeded to admit him to the Cleveland Clinic, where Dr. John Lampe ("Dr. Lampe") treated him.
Dr. Lampe testified that when he examined the infant, he spoke with appellant and Lisa and they told him they noticed some swelling on the baby's left thigh on Christmas Eve. They explained that the following day the swelling decreased, but it appeared again around January 1, 1997. Subsequently, Dr. Lampe contacted the Department of Human Services because "a femur fracture in a seven-week-old, * * * [was] suspicious enough * * * of child abuse that [he] wanted to have Social Services involved to try to help elicit more information as to what the circumstances were around this injury to the child." Dr. Lampe also conducted further tests, which revealed "that there was evidence of rib fracture" and that the infant had a subacute subdural hemorrhage or bleeding of the brain. He informed Lisa of all of the injuries that he had noted. Dr. Lampe testified that neither parent offered an explanation for any of the baby's injuries.
Appellee also presented the testimony of two other physicians at the trial. They both revealed that the injuries to the infant seemed comparable to a baby who was the victim of shaken baby syndrome. All of the physicians who testified believed that the infant received the injuries more than a week before his January 3, 1997 examination. Specifically, they felt that the broken leg occurred more recently than the other two injuries, but an exact date for the injuries could not be established.
Detective Tina McKamey ("McKamey") of the Streetsboro Police Department testified that she and a human service employee visited the infant in the hospital. On January 4, 1997, when she questioned appellant and Lisa, they stated that they did not know how the baby was injured. After a custody hearing, the department of children services placed the child in foster care.[1]
On January 8, 1997, appellant went to the police station for an interview. After he was read his Miranda warnings and signed a waiver, he told McKamey that he had an idea how his son may have been injured. He recalled while he was giving the baby a bath in a baby bathtub, the infant "slipped in the bathtub, lifted its leg, slipped under the water, starting choking, turning blue." He thought the child was going to drown and he panicked. Thereafter, he "reached in to grab him and pull him out as quickly as possible." Because his son appeared to be choking, he attempted CPR and pumped his abdomen. McKamey indicated that Kathleen declined an interview with McKamey, but Kathleen revealed that she had given her statement to another detective. At the trial, both Lisa and Kathleen characterized appellant as a good father.
At the conclusion of appellee's case-in-chief, appellant moved for a judgment of acquittal, which was overruled. Appellant presented no evidence in his behalf.
In a judgment entry dated January 30, 1998, appellant was found guilty of child endangering. Appellant's bond was continued pending a presentence investigation. On February 11, 1998, appellant filed a "Motion for Judgment Notwithstanding Verdict," which the trial court overruled on March 27, 1998. On May 20, 1998, appellant was sentenced to sixty days in jail and three years of community control. Moreover, appellant was ordered to perform one hundred hours of community service, undergo a psychological evaluation, and seek treatment if necessary. Appellant timely filed the instant appeal and now asserts the following assignments of error:
 "[1.] The trial court erred in denying [appellant's] motions for directed verdict and for judgment notwithstanding the jury verdict, as the evidence presented by [appellee] was, as a matter of law, insufficient to support conviction [sic].
 "[2.] Whether or not any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt solely upon circumstantial evidence which is amenable to reasonable interpretation consistent with innocence.
 "[3.] Whether or not, after weighing the strength and credibility of the evidence presented and the inferences to be reasonably drawn therefrom, this court concludes there is sufficient competent, credible evidence to permit reasonable minds to find guilt beyond a reasonable doubt."
As appellant's assignments of error are interrelated, they will be addressed in a consolidated fashion. Appellant attacks the sufficiency of the evidence as to his conviction and claims his conviction was against the manifest weight of the evidence.
In State v. Schlee (Dec. 23, 1994), Lake App. No. 93-L-082, unreported, at 10, we held:
 "`Sufficiency' challenges whether the prosecution has presented evidence on each element of the offense to allow the matter to go to the jury, while `manifest weight' contests the believability of the evidence presented.
 "`"(* * *) (T)he test (for sufficiency of the evidence) is whether after viewing the probative evidence and the inference[s] drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all of the elements of the offense beyond a reasonable doubt. The claim of insufficient evidence invokes an inquiry about due process. It raises a question of law, the resolution of which does not allow the court to weigh the evidence. * * *"'" (Emphasis sic.)
In Schlee, supra, unreported, at 11, we also stated that:
 "`[M]anifest weight' requires a review of the weight of the evidence presented, not whether the state has offered sufficient evidence on each element of the offense.
 "`In determining whether the verdict was against the manifest weight of the evidence, "(* * *) (t)he court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. (* * *)"' (Citations omitted.) (Emphasis added.) * * *"
A judgment of a trial court should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction."State v. Martin (1983), 20 Ohio App.3d 172, 175; see, also, State v. Thompkins (1997), 78 Ohio St.3d 380, 387.
In the case at bar, in order to convict appellant of endangering a child, pursuant to R.C. 2919.22(B)(1) and (E), appellee was required to prove beyond a reasonable doubt that appellant violated R.C.2919.22(B)(1), which states:
 "(B) No person shall do any of the following to a child under eighteen years of age * * *:
"(1) Abuse the child; * * *"
The Supreme Court of Ohio has held that the "existence of the culpable mental state of recklessness is an essential element of the crime of endangering children." State v. Adams (1980),62 Ohio St.2d 151, paragraph one of the syllabus. Furthermore, R.C.2901.22(C) states:
 "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. * * *"
The question before this court is whether appellant, with heedless indifference to the consequences, perversely disregarded a substantial risk to the infant's health. The evidence revealed that appellant watched his son from December 16, 1996 to December 20, 1996. Therefore, during the entire week while Lisa was at work, the baby was in the exclusive company and care of appellant. Further, although the medical testimony did not pinpoint an exact date for the injuries, the physicians concluded that the injuries were sustained more than a week before the baby was brought to the hospital on January 3, 1997. Further, the physicians' testimony revealed that the injuries to the infant seemed comparable to a baby who had been the victim of shaken baby syndrome.
Moreover, appellant admitted in his statement to McKamey that on December 18, 1996, while he was bathing his son, his son slipped and he had to perform CPR. After that incident occurred, he failed to take the infant to the doctor. He also acknowledged that he had grabbed his son out of the bathtub and pumped his abdomen. His failure to seek immediate medical attention demonstrates that appellant, with heedless indifference to the consequences, disregarded a substantial risk to the baby's health.
In addition, the baby's grandmother, Kathleen, who was the only other person that babysat him in December 1996, raised seven children. Dr. Villanueva testified that she had been the pediatrician for Kathleen's children and she did not ever recall treating any of them for unexplained injuries. At the time Kathleen was babysitting her grandson, she resided with her husband and four of her children, who were ages twenty-one, sixteen, fourteen, and nine. McKamey questioned Kathleen at her home regarding the safety precautions she took while she was watching her grandson. Kathleen stated that her children who lived with her had very little contact with the baby.
Additionally, when Dr. Lampe asked appellant to provide an explanation for his son's injuries, he could not offer one. A few days after the child was admitted to the hospital, appellant voluntarily came to the police station and relayed the story that the baby accidentally fell while he was being given a bath.
In the present matter, upon a thorough review of the record and the transcript from the trial, it is our determination that there was sufficient evidence presented to demonstrate that appellant's actions may have been reckless the week he babysat his son. This evidence, in conjunction with the medical testimony provided, supports the trial court's conclusion that the evidence comports with the elements necessary to convict appellant of child endangerment. It is our view that there was an adequate basis for the jury to conclude that the elements of child endangering by abuse were satisfied.
In addition, regarding the issue of manifest weight, we recognize that appellant presented no evidence in his case-in-chief. Hence, after reviewing the entire record, weighing the evidence and all reasonable inferences drawn therefrom, and considering the credibility of the witnesses, we cannot say that in resolving the evidential conflict here, the jury clearly lost its way and created a manifest miscarriage of justice. Appellant's first, second, and third assignments of error lack merit.
For the foregoing reasons, appellant's assignments of error are not well-taken. The judgment of the Portage County Court of Common Pleas is affirmed.
 ______________________________ PRESIDING JUDGE DONALD R. FORD
NADER, J., O'NEILL, J., concur.
[1] The baby was not returned to Lisa until September 1997.